IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

CORNEAL THRILL, JR.,

     Plaintiff,

v.                                                                  No. 12-1260

McNAIRY COUNTY BOARD OF
EDUCATION,

     Defendant.

_____

ORDER GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
_____

*INTRODUCTION*

In his amended complaint filed on November 20, 2012, the Plaintiff, Corneal Thrill, Jr.,

alleged violations by the Defendant, the McNairy County, Tennessee Board of Education (the

"Board"), of 42 U.S.C. § 1983; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

and the Tennessee Human Rights Act, Tennessee Code Annotated § 4-21-101, *et seq.*  Before the

Court is the Board's motion for summary judgment as to all claims pursuant to Rule 56 of the

Federal Rules of Civil Procedure.

*STANDARD OF REVIEW*

Rule 56 provides in pertinent part that "[t]he court shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "To survive summary judgment, the

nonmoving party must come forward with specific facts showing that there is a genuine issue for

trial."  <u>Pucci v. Nineteenth Dist. Ct.</u>, 628 F.3d 752, 759-60 (6th Cir. 2010) (citing <u>Matsushita Elec.</u>

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)) (internal quotation marks omitted).  "A genuine issue of material fact exists if a reasonable juror could return a verdict for the nonmoving party."  Id. at 759 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  "A fact is 'material' if its proof or disproof might affect the outcome of the suit under the governing substantive law."  Reeves. v. Swift Transp. Co., Inc., 446 F.3d 637, 640 (6th Cir. 2006).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  Bobo v. United Parcel Serv., Inc., 665 F.3d 741, 748 (6th Cir. 2012) (quoting Anderson, 477 U.S. at 255, 106 S. Ct. 2505).  "Entry of summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  In re Morris, 260 F.3d 654, 665 (6th Cir. 2001) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)) (internal quotation marks omitted).

## *FACTS*

Thrill, who is black, was employed by the Defendant as a custodian for McNairy County High School (MCHS) from the summer of 2010 until his termination on October 25, 2011.  At the time of his employment, there were six custodians at MCHS, including the Plaintiff.  Of those, four were black.  It is undisputed that Thrill is the only custodian to have been terminated in the last five years.

MCHS teacher Molly Stanfield recalled in her deposition that, prior to fall break in 2011, she procured drinks and snacks for a committee meeting scheduled for after teachers returned from the break.  She stored several cases of soda and water in three refrigerators in her home economics

classroom.  Upon her return from break, she discovered that the sodas had been removed.  She went to the office of the principal, Cecil Stroup, to inform him that the drinks were missing.  Assistant Principal Scott Powers offered to look at the surveillance cameras in the vicinity of her classroom in hopes of finding out how the drinks were taken and by whom.

In a videotape provided to the Court, Thrill can be seen at 4:08 a.m. on October 17, 2011 coming into view from around a corner, unlocking a classroom door and entering.  Two minutes later, he emerges with two cases of sodas, places them on the floor and closes and locks the classroom door.  He leaves the drinks and walks down the hallway out of view.  At 4:13 a.m., he comes back down the hall with a large case of soft drinks in one hand and what appears to be a large bag of chips in the other.  He stops to pick up the two cases of sodas he had previously left in the hallway and proceeds around the corner.  According to the Plaintiff, he removed from Stanfield's locked classroom two cases of Sprite, two cases of Coke and a half case of Mountain Dew.

Stanfield testified that, at some point either before or after she viewed the surveillance video in Stroup's office, Thrill confronted her in the hallway and told he had been "protecting" her Cokes for her.  She asked him to return them and he said he would.  When he failed to do so, she sent the shop teacher to the store to purchase more.  Later either that day or the next day, another custodian, Willie Robinson, who is black, appeared at her door and told her he knew where the drinks were.  He took Stanfield to the door of the school's boiler room and pointed to some Cokes on the floor, but she was uncertain as to whether they were the same sodas that had been stored in her classroom.

She subsequently spoke to Stroup and advised him she might know where the drinks were.  They returned to the boiler room together and discovered various drinks; chip bags, at least some of which were empty; and a mini refrigerator containing a large number of various drinks.

3

Custodian Ronnie Roden, who is white, testified that he heard teachers and other custodians talking about drinks missing after returning from the fall break.  He told Thrill -- the two were friends -- that he (Thrill) was being accused of stealing drinks.  Plaintiff denied it, and advised they were in the boiler room and showed them to his friend.  Roden reported to Stroup that he had seen drinks in the boiler room.[1]  Although some sodas were returned to her, it is undisputed Stanfield did not recover all the drinks taken from her classroom.  She recalled in her deposition that there was gossip around school that other petty thefts had occurred and that Thrill might have been responsible.

In his deposition, Stroup described Thrill as his friend.  Nonetheless, he stated, he had to protect MCHS and "[i]f somebody is taking things and stealing things and being involved in situations like that, they can't stay."  (D.E. 31-10 at 88.)  According to Stroup, it was he who made the initial decision to terminate the Plaintiff.  He showed Director of Schools Charlie Miskelly, who was his direct supervisor, the videotape and recommended discharge, with which Miskelly agreed.  Stroup described the so-called "Coke incident" as the "straw that broke the camel's back."  (Id. at 33-34.)  When asked in his deposition what he meant by this statement, Stroup testified that there had been previous incidents involving suspicious behavior by Thrill.  As to the first, he stated as follows:

> Well, I was up here at the courthouse one day and went back to school.  I could see my bookkeeper was rather upset.  They came and told me that she had -- she had went to the copier room to drop some things off, and Coach Day came to her and needed something out of her office.  He had brought her the money from the concessions, which we have a break at a quarter to 10:00.  They clean it out, bring

---

[1]Roden testified that the boiler room was located in a structure connected to the school building that could only be reached by exiting the main facility.  It was sometimes used for storage of school items.  According to Roden, the boiler room had two doors, only one of which was kept locked.

it in there, and she reconciles it.  At that particular time she did not have a lock on her door.  I think she was a new employee at the time.  But she had slid the box in under her desk.  Coach Day went to her and needed something out of the secretary's -- I mean out of the bookkeeper's office.  When he opened the door, Mr. Thrill was under the desk with -- and went to his pocket.  Of course, he couldn't prove anything.  He said he had a work order to fix a computer.  Nothing was wrong with the computers.  If it had been, the computer wire came through the ceiling and not from under the desk.  And he came back later pushing around on some wires in there, but he didn't have the expertise to fix a computer.  He didn't have a work order to fix a computer.  And I talked to him and told him not to do -- I think I may have had him sign a deal here, a letter saying that he had been in there, and he refused to sign it.  And Mr. Powers witnessed it.  But that was one.

(Id. at 34-35.)  This incident occurred on approximately October 27, 2010.

The bookkeeper, Regina Smith, had placed the concession money in a honey bun box she hid under her desk until she had time to count it.  She testified in her deposition that she and Coach Day initially decided not to tell anyone about what they thought they might have seen because they did not want to get Thrill into trouble.  A few days later, however, she went to Stroup's office to ask for a lock for her desk drawer.  The story came out during their conversation.  Afterward, she heard nothing else about it and never spoke to Plaintiff again.

Another incident involving Thrill occurred in connection with one of the school's vending machines.  Stroup recalled in his deposition that

[o]ne morning -- Ronnie Roden and Coach Day are generally the people that fill the [vending] machines up.  Ronnie Roden was filling the machines up probably earlier when Coach Day had got there.  He came in and told me he thought that Corneal had stole $20 out of the machine.  So while Ronnie was filling out the machine on this side, Corneal went in on this side and was doing something.  The camera -- you can't see him stealing nothing, but he did go to his pocket.  So with that incident I called Mr. [Harry] Crayton[2] up there and showed it to him after I had shown it to Corneal.  And Mr. Crayton -- I believe I'm correct in saying this -- also emphasized, Corneal, you need to stay away from that.  It looks awfully suspicious.  I didn't see the $20, but I saw him reach in that machine and go into his pocket.

_____

[2]Crayton, who is black, is employed as a counselor at the school.

5

(Id. at 42.)  Roden acknowledged seeing a video of the incident and that Plaintiff's hand was near where the money in the machine was stored.  Thrill was not written up for either of these occurrences.

In another incident, Stroup stated that

[w]e were getting ready for school to start.  Parents were bringing kids in to be registered.  Over at the auxiliary gym at entrance number three, so I was told when I got back, that [Thrill and Robinson] just had a big cuss fight over there, cussing each other, hollering and yelling, using all kinds of obscenities.  And I suspended both of them for three days.

(Id. at 48.)

The principal also received a call from the school's technology head who reported that one of his technicians "thought he saw Corneal with two laptops, and he was acting awful suspicious." (Id. at 71, 73.)  One of the laptops, high-tech models used as teaching tools, was later located behind a dryer in the special education room, but the other was never found.  There is no indication from Stroup's testimony that he confronted Thrill about the laptops, although he did peek inside Plaintiff's vehicle and saw nothing.  Stroup also heard that Thrill had stolen change on two or three occasions from the cash register of a school store by using a ladder to climb over a cinder block wall.  According to the principal, the thefts began during Plaintiff's tenure and ended after he was fired.  Stroup stated that he did not contact law enforcement concerning any of the thefts because he was "trying to protect the man down there a little bit.  He's trying to get his life straightened out, go back to school. . . .  I was hoping he would get things worked out."  (Id. at 77-78.)

At one point, Stroup showed Coach Day a surveillance video of Thrill walking through the gymnasium carrying something that appeared to be a computer printer or a VCR.  Day stated in his deposition that he had permitted the Plaintiff to store some of his personal belongings temporarily

6

in a gym locker room while he changed residences.  The coach told the principal that he could not

tell what the item was but would check the coaching office to see if anything was missing.  He

returned to Stroup's office to report that nothing had been taken and that he had allowed Thrill to

store personal items in that area.  The incident was apparently not investigated further.

The principal gave the following testimony concerning the Coke incident:

See, what had happened, we was on fall break.  Corneal was sick a lot.  I don't know
if this particular incident was for makeup time or he had came to me and wanted to
work extra.  I got it okayed by Mr. Miskelly.  He wanted to go in and double clean
some of his rooms.  When I say "double clean," move things over, spray buff it, give
it an extra cleaning, so I agreed to that.  I think it was on a Monday.  I don't know.
He came in.

I will skip to Thursday.  Thursday I was -- went to the bus barn or something.
School did not begin until twelve o'clock.  We had a parent/teacher conference.  At
eleven o'clock we had a vocational meal where vocational people and parents --
vocational people and parents come in and they have a meeting.  It's a state-mandated
deal.  So they had went and bought chips, honey buns, stuff like this and put it in the
home ec room.  Well, she came and asked Mr. Powers, [s]omebody's got my stuff
that I'm going to feed these people with.  So, anyhow, him and her goes in there and
looks on the video.  I think it was around 4:00 or 4:30 in the morning, which that
doesn't bother me because, you know, I've always let Corneal and let Ronnie work
early.  But he goes in the home ec room, opens the door, turns the light on, comes
back out with a couple of handfuls of stuff, sets it down in the floor, cuts the lights
off, locks the door, goes down to the band hall, opens it up, gets Cokes there and
brings them all back up there, locks that door, he takes them down and comes down
the hall.  That's as far as I could see because I didn't have my pan-zoom camera at
that time.  And he -- we have an answering machine in our office that he's called no
telling how many times and says, Mr. Stroup, I'm sick.  I never questioned that.  I
have yet to receive a phone call saying, Mr. Stroup, I moved these somewhere or
whatever.  I showed it to Ronnie and asked him did he know anything about it, and
he said no.  All the teachers already knew about it.

\*       \*       \*

. . . On Monday he goes in and sets those things down in my office.  I don't know if
I was even in there at that time, but about half of it was in there.  Well, when we
questioned him about that, he says he took it out of two locked classrooms that
nobody could get into except the teacher and the custodians and took it to the
electrical and boiler room for safekeeping.  That's what he said, for safekeeping.  All

7

right.  That room stays open all the time because that's where we turn all the hall lights on.  We never lock it from four o'clock in the morning until about nine o'clock at night.  So why would you take things out of those rooms and put it down there?  And when you come back, he didn't say it was missing.  He did not tell me that anything was missing.  But about half of it was gone or more.  He never called me and told me, you know, I put that over there in that room for safekeeping.  He was not told to take anything out of that room.  He did that on his own.  So that was the straw that broke the camel's back.

(Id. 58-61.)

In addition to being fired, the Plaintiff was banned from school property.  The Defendant's stated reason for this action was Thrill's belligerent attitude toward school officials at the time of his discharge as well as a desire to avoid future thefts of property.  Stroup advised in his deposition that others had been banned from school property in the past, primarily parents whom he considered were acting inappropriately.  He had also prohibited students and parents from attending sporting events involving the school.

Thrill was generally thought of as likeable and a hard worker.  He vehemently denied involvement in any theft of school property.  With respect to the vending machine incident, he explained in his deposition that Coach Day and Stroup told the custodians they could take food and drinks from the machines without paying for it.  Defendant disputed Plaintiff's assertion, pointing to Day's deposition testimony that custodians were sometimes given snacks the administration did not want put in the machines because they were damaged or irregular.  On the day in question, he took a package of Starburst from the machine, rather than money, when Roden was filling it.  Plaintiff claimed in his deposition that the vending machine incident was discriminatory because he was called into Stroup's office and questioned about theft while Roden was not.[3]

---

[3]There is no evidence that the surveillance video indicated Roden took anything from the machine.  Moreover, Plaintiff acknowledged that it was Roden's job to open and fill the

As for the alleged theft of funds from the honey bun box under Smith's desk, he insisted that he was in her office to work on ceiling tiles and that he was on a ladder the entire time, not under the desk.  He related that at one point during his work, he pulled a box cutter from his pocket in order to shape a tile and a paper bill became wrapped around it.  He was later called to Stroup's office, questioned about the missing money and asked by Day to empty his pockets.  He complied and was told to stay away from the bookkeeper's office and return to work.

When asked why he took the drinks from Stanfield's room, Plaintiff testified that, "Because I was getting ready to do the floors in the rooms.  I moved the items off the floor.  I moved items off the table that was in Ms. Stanfield's room because I was going to move the tables back.  And the drinks that I moved from the choir room first door, I was going to do the floors like I always have done."  (D.E. 31-18 at 122-23.)  He recalled as follows:

> After that morning, after I was called into the office and they asked me about the drinks -- I guess it had to be about 8:30, may nine o'clock -- I was going down the C-Pod hallway, and I seen Ms. Janet Stanfield.  And I approached her, and I said, Ms. Stanfield, I'm the one who removed those drinks from your room, and I locked them up out there in the boiler room.  She stated to me, There was none on the table. I said, Yes, ma'am, there was.  She said, No, there wasn't.  I said, Okay, and I walked away.  I'm not sure what was said to Mr. Stroup about this here, but it came back to me that Ms. Stanfield didn't like the way that I approached her.  I didn't know of no other way to approach her.

(Id. at 125-26.)  When asked what Stanfield did that was discriminatory, he said,

> First of all, I approached Ms. Stanfield myself.  Didn't nobody tell me to go tell Ms. Stanfield this or go tell her this.  I approached her as a worker, as someone who had moved something from her room.  And when she said to me that, No, those drinks was not on the table, I felt like things was fixing to get ready to escalate. . . .  So that's the reason I walked away from the situation . . . and went down the hall.  I took offense to how she said it to me.

---

machines.

*       *       *

> Well, Ms. Stanfield and Mr. Robinson went into the boiler room and removed those drinks without -- I don't know whose permission. When I reported where the drinks was, didn't nobody ever go out there and verify that they was there. But the day after -- not the day after. The day I got fired or was asked to resign, which I didn't, her and Mr. Robinson went upon themselves to go out to the boiler room and removed these items.

*       *       *

> . . . [T]hey didn't have authority to -- I don't know what authority they had, but someone else that was either Mr. Stroup or Mr. Powers should have went out there or myself and brought those drinks to the office, which I was the one that moved them. Since I was the one that moved them, I went to inform them to let them know who had moved them, where they was, where they was placed at, that they could be returned to them.

(Id. at 129-31.) He added that Roden told him that "[w]hen he came in to put the machines back in the boiler room that Ms. Stanfield and Mr. Robinson was startled. One had a case of Sprite, and the other one had a case of Cokes. Those was not Ms. Stanfield's drinks. The drinks that Ms. Stanfield had was two cases of Sprite. Them is the only one that should have been returned to her." (Id. at 134.)

In explaining the basis for his race discrimination claim, he responded thusly:

> On the basis of race discrimination, first of all, you accuse me of stealing something. I'm a black person. You accuse me of stealing something, but one of the teachers or one of the custodians can take it upon themselves to go outside and do something that someone should have had the authority to go out there and bring them drinks back in. If anybody should have brought those drinks back in that morning, it should have been me, into the office so they could see that the drinks was still there. I'm accused of being -- stealing some drinks. I feel like I'm being -- like I said, black person needs to stay in their place. I'm one that speaks up for myself. I'm sorry, you know. I want to be treated the same way anybody else do, and I feel like on this basis it's discrimination.

*       *       *

> Because of my race not following the way that McNairy Central want a black person

10

to do . . .  First of all, Mr. Willie Robinson has been known -- the teacher knew it, that things was missing out of their areas, okay, but there was nothing done about this.  But when it comes to me personally as a person that would stand up and speak for himself, yes, I've been racially discriminated against because I'm standing up.  I'm standing up for myself because of something that I didn't do, and I'm being singled out because of the videos, for one, that was shown, because the video that I seen for the first time -- for the first time yesterday was shown to me here is nothing but discrimination.  Because anytime that you don't take a full story and put it together and only give pieces, yes, it looks like somebody is doing something wrong.  But if you take a whole picture and put it together, you can come to some kind of conclusion.  And I came to the conclusion, yes, I'm being racially discriminated against.  Because I did my job the way I'm supposed to do it.  Didn't nobody have to lead me through it or whatever.  But when things start happening like the little -- I mean the little vending machine incident, the little office incident, and now this.

(Id. at 134-37.)

*ASSERTIONS OF THE PARTIES AND ANALYSIS*

Federal Claims.

*42 U.S.C. § 1983*

Section 1983 provides in pertinent part that

[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983.  The statute "creates no substantive rights, but merely provides remedies for deprivations of rights established elsewhere."  Flagg v. City of Detroit, 715 F.3d 165, 173 (6th Cir. 2013) (internal quotation marks omitted), *reh'g & reh'g en banc denied* (June 18, 2013).  In order to succeed on a § 1983 claim, a plaintiff must show that the defendant "acted under color of state law" and that its "conduct deprived the plaintiff of rights secured under federal law."  Handy-Clay v. City of Memphis, 695 F.3d 531, 539 (6th Cir. 2012).  The dispositive motion focuses on the latter

11

element of the § 1983 claim.

Thrill argues that the Defendant's actions in prohibiting him from coming onto school property failed to pass constitutional muster.  However, "[m]embers of the public have no constitutional right of access to public schools." Vukadinovich v. Bd. of Sch. Trs., 978 F.2d 403, 409 (7th Cir. 1992) (plaintiff's first amendment claim based on restriction of access to public school failed because, once he was fired by the school board, he became a member of the public, to whom access thereto was not protected by the constitution), cert. denied, 510 U.S. 844, 114 S. Ct. 133, 126 L. Ed. 2d 97 (1993).  "School officials have the authority to control students and school personnel on school property[.]" Lovern v. Edwards, 190 F.3d 648, 655 (4th Cir. 1999); accord Ritchie v. Coldwater Cmty. Schs., No. 1:11-CV-530, 2012 WL 2862037, at *16-17 (W.D. Mich. July 11, 2012) ("citizens do not have an unfettered right of access to school property simply because it is public"); Gaines-Hanna v. Farmington Pub. Sch. Dist.. No. 04-74910, 2007 WL 1201567, at *3 (E.D. Mich. Apr. 20, 2007) (same); Mejia v. Holt Pub. Schs., No. 5:01-CV-116, 2002 WL 1492205, at *4-6 (W.D. Mich. Mar. 12, 2002) (same).  Accordingly, Plaintiff lacks a constitutional claim based on his banishment from the school campus.

He further maintains that the Defendant's ban on his attendance at school sporting events violated his fundamental constitutional right to intrastate travel.  Such a right has been recognized by the Sixth Circuit.  See Johnson v. City of Cincinnati, 310 F.3d 484, 497-98 (6th Cir. 2002), cert. denied, 539 U.S. 915, 123 S. Ct. 2276, 156 L. Ed. 2d 130 (2003).  Johnson defined the right as one "to travel locally through public spaces and roadways." Id.  Thrill was not prohibited by the Board from traveling through public spaces and roadways, but, rather, to specific places -- that is, venues where MCHS sporting events were being played.  Courts have held that the right to intrastate travel

does not encompass the right to access certain spaces.  *See* Hanneman v. S. Door Cnty. Sch. Dist., 673 F.3d 746, 757 (7th Cir. 2012) ("The right to intrastate travel protects the right to move from place to place, not the right to access certain public places."); Ritchie v. Coldwater Cmty. Schs., 947 F. Supp. 2d 791, 818-19 (W.D. Mich. 2013) ("the right to travel does not encompass the right to access particular government property").  This claim, too, must fail.

*Title VII*

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . ."  42 U.S.C. § 2000e-2(a)(1).  A discrimination claim may be proven using either direct or circumstantial evidence.  Kuhn v. Washtenaw Cnty., 709 F.3d 612, 624 (6th Cir. 2013).  "Direct evidence is proof that, if believed, compels the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  Id. (internal quotation marks omitted).  In the absence of direct evidence, courts are directed to utilize the familiar burden-shifting analysis articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  Davis v. Cintas Corp., 717 F.3d 476, 491 (6th Cir. 2013), *reh'g & reh'g en banc denied* (Aug. 7, 2013).

A plaintiff relying only on circumstantial evidence, such as Thrill, must first make out a prima facie case of discrimination.  Id.  To demonstrate a prima facie case based on circumstantial evidence, he must show that "(1) he was a member of a protected class, (2) he suffered an adverse employment action, (3) he was otherwise qualified for the position, and (4) he was replaced by someone outside the protected class or treated differently from a similarly situated, non protected employee."  Deleon v. Kalamazoo Cnty. Rd. Comm'n, 739 F.3d 914, 918 (6th Cir. 2014).

13

If the plaintiff demonstrates a prima facie case of discrimination, the employer must "articulate some legitimate, nondiscriminatory reason for its employment decision." Rachells v. Cingular Wireless Emp. Servs., LLC, 732 F.3d 652, 661 (6th Cir. 2013), *reh'g & reh'g en banc denied* (Nov. 22, 2013). The defendant's burden is one of production, not persuasion. Adamov v. U.S. Bank Nat'l Ass'n, 726 F.3d 851, 855 (6th Cir. 2013). Upon the defendant's showing, the plaintiff "must point out evidence from which a jury could reasonably reject [the employer's] explanation as pretextual." Rachells, 732 F.3d at 661 (internal quotation marks & alterations omitted). The employee "bears this third burden, even when opposing a motion for summary judgment." Davis, 717 F.3d at 491.

"[A] plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." Tingle v. Arbors at Hilliard, 692 F.3d 523, 530 (6th Cir. 2012). These categories, however, are nothing "more than a convenient way of marshaling evidence and focusing it on the ultimate inquiry: did the employer fire the employee for the stated reason or not?" Id. (internal quotation marks omitted). "Whichever method the plaintiff employs, he always bears the burden of producing sufficient evidence from which the jury could reasonably reject the defendant's explanation and infer that the defendant intentionally discriminated against him." Seeger v. Cincinnati Bell Tel. Co., LLC, 681 F.3d 274, 285 (6th Cir. 2012). "[A]t bottom the question is always whether the employer made up its stated reason to conceal intentional" discrimination. Tingle, 692 F.3d at 530.

In this case, even if Thrill could establish a prima facie case, the Board has produced a legitimate, nondiscriminatory reason for his termination -- theft of items from Stanfield's classroom

-- that the Plaintiff has failed to show was pretextual.  Thrill maintains that the Defendant's stated reason was false and not a sufficient motivation for termination because (1) it knew prior to his discharge that the drinks were not in fact missing; (2) Defendant knew the previous accusations of theft were untrue; and (3) racial slurs by a fellow employee, Miskelly's inability to articulate a reason for Thrill's firing to a local NAACP representative, and other instances of racial bias warrant an inference of discrimination.

The Plaintiff's first proffered basis for pretext is simply not supported by the evidence. Viewing the proof in the light most favorable to Thrill, he took cases of soft drinks from Stanfield's classroom and placed them in the boiler room for safekeeping while he cleaned the floors.  Although he later advised school employees as to their location, it is undisputed that not all of the drinks were recovered from the boiler room.  According to the evidence presented, no explanation was offered by Thrill, either to his employer or to this Court, as to what happened to the drinks that were unaccounted for.  Plaintiff conceded in his deposition that taking personal property belonging to the school would have been a reasonable basis for termination.

Thrill also insists that there was never any proof he was actually guilty of the earlier petty thefts at the school.  In this regard, he asserts that "when anything came up missing in the school, school officials assumed, incorrectly, that the black janitor [(Thrill)] must have done it" and "Corneal Thrill was black, so he must be the thief[.]"  (D.E. 38 at 2.)  The glaringly obvious flaw in Plaintiff's argument, of course, is that he was one of several black janitors, the rest of whom were not accused of the thefts. [4]

---

[4]Plaintiff argued in his brief that "interestingly, a theft that occurred after Thrill was fired has now been blamed on a female African-American custodian."  (D.E. 38 at 2.)  The assertion appears to suggest that, once Thrill was gone from the scene, school officials focused their racial

In addition, under the "honest belief" rule adopted by this Circuit, "so long as an employer honestly believed in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be mistaken or incorrect." Kurincic v. Stein Inc., 30 F. App'x 420, 425 (6th Cir. 2002). "The law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with." Thomas v. Kmart Corp., Civ. Action No. 4:04CV-171-M, 2006 WL 2802266, at *9 (W.D. Ky. Sept. 28, 2006) (quoting Hartsel v. Keys, 87 F.3d 795, 801 (6th Cir. 1996)). "The employer may fire an employee for a good reason, a bad reason, *a reason based on erroneous facts*, or for no reason at all, as long as its action is not for a discriminatory reason." Id. (emphasis in original) (quoting Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187 (11th

---

animus on the next available black employee. The evidence paints a different picture, however. In his statement of facts, Plaintiff averred that the black female custodian, Maudena Atkins, was "questioned" about plates allegedly stolen from the school cafeteria, citing to pages forty-nine through fifty-one of her deposition. The referenced testimony reveals that Atkins testified only that the cafeteria supervisor told her some plates were missing. There is no testimony therein that she was "questioned" about the plates or that she was or felt she was being accused of theft. Atkins specifically stated that no one had mistreated her or discriminated against her because of her race. Plaintiff further maintained that Farrah Bills, another black female custodian, "testified that [Atkins] was questioned regarding the missing cafeteria plates because Defendant believes Ms. Atkins took them, stating 'they keep pointing the finger at Maudena.'" (D.E. 40 at 30.) While she did make the fingerpointing statement, Bills also admitted knowing nothing about the incident, stating, "I don't know because I don't work the summer, and I'm the only one that don't work the summer. So I really don't know." (D.E. 38-13 at 23.) Bills did not testify that school officials questioned Atkins regarding the plates or specifically that the Board believed she took them. Plaintiff has presented no other evidence that Atkins was accused of taking the plates.

Thrill also charges that Atkins testified at page twenty-one of her deposition that "Defendant assumed that Plaintiff was responsible for missing items because he is African American." (D.E. 40 at 38.) The page cited contains no such testimony.

Finally, he suggests that Robinson was likely a thief. Again, such an assertion goes nowhere in proving a race discrimination claim, as Robinson is black.

Cir. 1984)).  This is true whether the plaintiff is black or white.  "The salient issue in a Title VII

claim of discrimination is whether the plaintiff was singled out because of his or her membership

in a protected class and treated less favorably than those outside the class, not whether the plaintiff

was treated less favorably than someone's general standard of equitable treatment." Willis v. Valley

Residential Servs., No. 06-13686-BC, 2008 WL 1820892, at *5 (E.D. Mich. Apr. 22, 2008) (internal

quotation marks omitted) (citing Batts v. NLT Corp., 844 F.2d 331, 337 (6th Cir. 1988)).  In this

case, even if school officials were confused or wrong about him stealing money from the vending

machine, the honey bun box or the class store, or electronics from the gym, there has simply been

no evidence presented from which a reasonable jury could infer from the prior incidents that Thrill

was singled out *because of his race*.

Plaintiff's third assertion in support of pretext suggests an alleged discriminatory atmosphere

against blacks at MCHS.[5]

> In the context of evaluating evidence of pretext, [the Sixth Circuit] has explained
> [that c]ircumstantial evidence establishing the existence of a discriminatory
> atmosphere at the defendant's workplace in turn may serve as circumstantial evidence
> of individualized discrimination directed at the plaintiff.  While evidence of a
> discriminatory atmosphere may not be conclusive proof of discrimination against an
> individual plaintiff, such evidence does tend to add ["]color["] to the employer's
> decisionmaking processes and to the influences behind the actions taken with respect
> to the individual plaintiff.

Rachells, 732 F.3d at 665 (quoting Risch v. Royal Oak Police Dep't, 581 F.3d 383, 392 (6th Cir.

2009)).  "[E]vidence of a discriminatory atmosphere is not rendered irrelevant by its failure to

---

[5]Thrill avers that school officials overlooked the faults of Robinson, a former special
education student at MCHS who suffered from a mental disability, which apparently included
theft.  He also points to testimony of other custodians that Robinson did not like him, started
rumors that Thrill was a thief, and was generally a troublemaker.  To the extent any of this
evidence is offered to show a discriminatory atmosphere, it is of dubious value given that
Robinson is black.

coincide precisely with the particular actors or timeframe involved in the specific events that generated a claim of discriminatory treatment." Id. "[E]ven the conduct of a nondecisionmaker may be probative of whether an adverse action directed at a plaintiff was racially motivated."[6] Id.

Thrill first refers to racially charged statements made by Anthony Dickey in his position as a school administrator and Plaintiff's supervisor.  Specifically, Thrill testified in his deposition that Dickey once asked Roden "had they got rid of that nigger yet or where is your nigger friend at?," referring to Plaintiff.  (D.E. 31-17 at 56.)  In his brief, he points to the McNairy County Schools' website which reflects that Dickey was in charge of the maintenance department.  According to Miskelly, the website's designation, which placed Dickey's name next to the word "Maintenance" under the heading "District Administration," was misleading in that Dickey was merely the contact person for the maintenance department based on his seniority with respect to his fellow maintenance workers.  On an organizational chart submitted to the Court by the Defendant, Dickey is listed along with two others under the heading "Maintenance" with no designation of being in a supervisory position.

Plaintiff also cites to the depositions of Roden and MCHS secretary Yvette Damron, as well as to his own, for the proposition that school employees nonetheless *perceived* that Dickey was the supervisor of the maintenance department.  However, even if Dickey was or was perceived to be so,

---

[6]Factors to be considered in determining the significance of a discriminatory remark include "the declarant's position in the employer's hierarchy, the purpose and content of the statement, and the temporal connection between the statement and the challenged employment action, as well as whether the statement buttresses other evidence of pretext." Bartlett v. Gates, 421 F. App'x 485, 491 (6th Cir. 2010).  Thrill does not address these factors.

18

there is no evidence that he was *Thrill's* supervisor.[7]  It is undisputed Thrill was a custodian, not a maintenance worker.  Plaintiff himself specifically stated on at least two occasions in his deposition that Dickey was *not* his supervisor.  Neither Roden nor Damron testified that Dickey supervised the Plaintiff.

Thrill also points to certain deposition testimony of Stroup apparently for the purpose of showing that the principal, who it is undisputed actually made the recommendation to fire him, was of a like mind with Dickey and tolerated or would have tolerated such language, to-wit:

Q:     There's been some testimony, Mr. Stroup, that Mr. Dickey has used the N word, nigger, in reference to employees, and one of those employees being Mr. Thrill.  Does that surprise you?

A:     Well, I think most everybody -- no.  I mean, I don't know if he would or not.  I've never heard him do that to Mr. Thrill if that's what you're asking me.

(D.E. 31-10 at 54.)  This evidence is weak and becomes even weaker in light of the testimony that follows it:

Q:     The testimony, so I'm clear, is not that he ever said it to Mr. Thrill personally.

A:     Oh.

Q:     He said it to other employees about Mr. Thrill.

A:     He's never said that in front of me.

Q:     Has he ever said that word in front of you?

A:     Never said that word in front of me because that word is not in my vocabulary, period.  I've had to get onto parents for that.  But that don't use that word in front of me, be it black or white.  And believe it or not, there are

---

[7]In his deposition, Dickey explained that he knew who Thrill was but did not hire him, supervise him, work with him, or fire him.  He further denied speaking with the principal or director of schools about the decision to discharge Plaintiff.  Nothing in Thrill's deposition contradicts this testimony.

some blacks that will use it, but they ain't going to use that in front of me, okay.

Q:     If you knew that Mr. Dickey had said that about some employees at your school --

A:     I would go right to that man sitting right down there because he doesn't work for me.  He works for him.  I would go right to him and tell him.

Q:     I'm sort of translating or reading between the lines that you wouldn't like it?

A:     No, I would not like it, no.  Like I said, it's not in my vocabulary, I promise you.

(Id. at 54-55.)

Thrill did not report Dickey's alleged use of offensive language to Stroup, stating that he had once heard that "a man is considered a boy in Mississippi" and "Mr. Stroup was from Mississippi," even though Stroup never called him "boy" or anything else of a derogatory nature.  (D.E. 31-17 at 76-78.)  Instead, he told Crayton, who is black.  The first question Crayton, who was neither an administrator nor Plaintiff's supervisor, asked was whether Thrill had taken the problem to Stroup.  Plaintiff had not, but hoped Crayton would mention it to Stroup at lunch or in a meeting, although he apparently did not tell Crayton so.  While Thrill attempts to attach some significance to the fact that he was fired four or five months after his conversation with Crayton, there is no evidence to suggest that the counselor ever broached the subject with Miskelly or Stroup, or with anyone for that matter.  Nor is there evidence that would link Crayton to the decision to terminate the Plaintiff.

In short, there is no evidence Dickey had any knowledge of, involvement in or influence on the events leading up to and/or including the decision to fire the Plaintiff.  Nor is there proof referenced in Plaintiff's brief showing that alleged racially charged statements by Dickey were known or tolerated by Miskelly; and the evidence cited as to Stroup contributes little to support such

20

a showing with respect to the principal.  *See* Rachells, 732 F.3d at 667 (supervisor's failure to investigate multiple complaints of discrimination in performance evaluations and tolerance of subordinate's undeservedly poor evaluations of minority employees and preferential treatment of white workers in promotions and disciplinary actions was probative of whether plaintiff was singled out for discharge because of his race).

Plaintiff also relies on the deposition testimony of NAACP representative Delores Westbrook as probative evidence of a discriminatory atmosphere.  Specifically, he refers to her recounting of a conversation between her and Miskelly after the firing, in which he "did not have a valid reason for the termination, nor did he even have a grasp as to what Thrill had supposedly done to deserve termination." (D.E. 38 at 18-19.)  This assertion is somewhat puzzling, as the cited portion of her deposition clearly indicates that Miskelly told her that Plaintiff was fired after removing soft drinks from a classroom.  Her characterization of his explanation as not "valid" has no bearing on the Court's analysis.

Further, Thrill points to statements in Westbrook's deposition concerning "other acts" of race discrimination.[8]  Westbrook recalled an incident involving racial statements by a white police officer to a black teenager at the district's alternative school.  She also referenced an occasion when students were forced to attend basketball practice on Martin Luther King day.  When the students, who were both black and white, expressed annoyance at having to practice on a day school was not in session, the coach made them run.  Later, in the locker room, a black female player stated that if she had a

---

[8]Plaintiff defines "other acts" in the employment context as "testimony or other evidence of discrimination by the employer against non-party employees." (D.E. 38 at 19.)  The Court notes that all of the instances of alleged racial discrimination recounted by Westbrook in her deposition were directed toward black students, not employees.

gun she would shoot herself.  The statement was reported by a fellow student and she was suspended.  Westbrook related that, on another occasion, a young white child told a black child on the school bus that his father told him to kill "niggers."  Officials at the public elementary school in Selmer, Tennessee where the students attended refused to take action against the white child.  In another occurrence, a black female athlete missed practice because she was late returning from a field trip and was suspended from a game.  The girl's father went to the game and confronted the coach, which led to his removal from the premises and prohibition from attending future games.

Westbrook remembered another child, presumably black, who resided with his mother in Selmer and signed up to play basketball in Bethel Springs, Tennessee, where he was to live with his grandmother.  The Selmer coach did not want the child transferred and wrote a letter to the Tennessee Secondary School Athletic Association (TSSAA) advising that the boy in fact still lived in Selmer with his mother.  After the coach began driving slowly past her house and asking neighborhood children if the child was in the home, his mother complained to Westbrook. Westbrook took the matter to Miskelly, who prohibited the coach from further communication with the TSSAA.  The boy played basketball at Bethel Springs.

Several times during her deposition, Westbrook characterized these incidents, as well as those at issue in this case, as discriminatory based on the "Delores theory" or a "Delores perception." Again, her personal theories or perceptions on liability are not binding on this Court.  Indeed, there is nothing to indicate that any of the incidents described by Westbrook had anything to do with race other than the statement made by the white child on the bus.  That incident is far removed from that at hand and in no way adds "[']color[']" to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff."  *See* <u>Rachells</u>, 732 F.3d

22

at 665.

Lastly, the Plaintiff relies on a chart showing the numbers of McNairy County School District staff members by race, dated September 25, 2012.  The chart indicates an overwhelming number of white employees in comparison to black employees.  However, this Circuit has held that statistical evidence must be coupled with independent circumstantial evidence of discrimination, which, as the Court has pointed out previously herein, does not exist here.  *See* Hopkins v. Canton City Bd. of Educ., 477 F. App'x 349, 359 (6th Cir. 2012).  Moreover, Thrill has failed to provide any statistics concerning the number of qualified black applicants who applied for school district jobs.[9] "Without evidence of the racial composition of the pool of qualified candidates, a reasonable factfinder would be unable to determine whether bias motivated [the employer's] decisions, or if the decisions were based on legitimate selection criteria or chance."  Hawkins v. Memphis Light Gas & Water, 520 F. App'x 316, 322 (6th Cir. 2013).

Viewing the evidence presented with respect to discriminatory atmosphere in the light most favorable to the Plaintiff, the Court finds that a reasonable jury could not find that Defendant's termination of his employment was a pretext for discrimination based on race.  "[T]he [c]ourt's role is not to determine whether an employer's decision to fire an employee was wise, right or otherwise.  An employee may allege he has been subjected to a great deal of mistreatment by a supervisor. [Courts] do[] not condone such behavior; yet, even assuming the allegations of poor treatment by one's employer are true, a court has no role in curing those wrongs unless the employer's actions

---

[9]Defendant has produced a United States Census Bureau report indicating that, in 2012, six percent of McNairy County's population was black and slightly over ninety-two percent was white.  The Plaintiff has averred that five percent of McNairy County School District employees are black.  Thus, it appears to the Court that the racial make-up of the McNairy County Schools staff reflects that of the community.

violate the law." Anderson v. Mead Johnson Nutritional Group, Bristol-Myers Squibb, 910 F. Supp. 376, 380 (E.D. Tenn. 1996), *aff'd* 107 F.3d 870 (6th Cir. 1997). At bottom, Thrill's Title VII claim rests upon nothing more substantial than personal beliefs, conjecture and speculation, which are insufficient to defeat Defendant's motion for summary judgment. *See* Grizzell v. City of Columbus Div. of Police, 461 F.3d 711, 724 (6th Cir. 2006) ("It is well settled that mere personal beliefs, conjecture and speculation are insufficient to support an inference of discrimination."). The claim is DISMISSED.

State Law Claim.

"When all the federal claims in a case have been dismissed, there is a strong presumption in favor of dismissing any remaining state law claims unless the plaintiff can establish an alternate basis for federal jurisdiction." Bishop v. Children's Ctr. for Developmental Enrichment, 618 F.3d 533, 538-39 (6th Cir 2010) (citing United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966)). Thrill has failed to make such a showing. Accordingly, his state law claim is DISMISSED.

*CONCLUSION*

For the reasons articulated herein, the Defendant's motion for summary judgment is GRANTED. The Clerk is DIRECTED to enter judgment in favor of the Defendant.

IT IS SO ORDERED this 4th day of March 2014.

s/ J. DANIEL BREEN
CHIEF UNITED STATES DISTRICT JUDGE

24